## Oakes v. Oakes, et al.

(Decided May 30, 1924.)

### Appeal from Logan Circuit Court.

1. Appeal and Error—Error in Leading Questions Waived by Failure to Object.—Any error in leading questions to witness must be treated as waived, where record does not disclose any objections.

2. Trusts—Evidence of Trust in Land Need Not be Entirely Free from Contradictions.—Rule requiring evidence to establish a trust in land to be clear and convincing does not mean that it must be entirely free from contradictions.

3. Appeal and Error—Every Presumption in Favor of Correctness of Judgment Below.—Every presumption is in favor of correctness of decision of trial court, and, in order to warrant reversal, error must affirmatively appear from record.

S. R. CREWDSON, O. M. SMITH and COLEMAN TAYLOR for appellant.

S. Y. TRIMBLE for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming.

Appellant sued for possession of a tract of 124½ acres of land known as the "E. R. W. Thomas farm." Appellees answered and claimed this farm as the widow and children of B. B. Oakes. The court found for them and dismissed the appellant's petition.

The Oakes family consisted of four brothers and one sister, whose names we will now give in the order of their

ages: A. K. (Mack) Oakes, W. B. (Butler) Oakes, Kate Smith, L. M. (Monroe) Oakes, and B. B. (Ben) Oakes. These parties inherited a tract of land from their father, which was divided among them. Shortly after this division Kate Smith sold her share to her brother Monroe. The four brothers lived near each other and were engaged in several partnership enterprises. They owned a sawmill and threshing machine together and for some years Monroe Oakes and Ben Oakes were engaged in farming together. From the record it appears that all of them were quiet, plain, unassuming people, of rather retiring dispositions, except Monroe Oakes, who was evidently quite the reverse. The proof shows that he signed the names of his brothers to notes and other papers; that he paid their taxes; that he prized and shipped their tobacco; that he sold and handled their crops, and in general was the business agent for the Oakes family. The record shows that this attention to the business of the Oakes family was not confined to partnership affairs, but extended to the private and personal affairs of his sister and brothers. In 1884, Ben Oakes lost his home by fire, and soon thereafter he rented the farm in controversy, and moved his family to the house thereon. In 1885, he occupied this farm as a renter. In the meantime he was preparing to build a new house on his own farm. The four brothers then owned a sawmill and they had begun to saw the house pattern when this E. R. W. Thomas farm was advertised for sale. Ben Oakes met and discussed with his brothers the advisability of buying this farm, and it was decided that it would be a wise thing to do, as they concluded that he could probably buy the farm with the buildings on it for less money than he could build a house on his own farm.

Kate Smith and her husband, J. V. Smith, were then visiting Monroe Oakes, and he told them on Saturday before the place was to be sold on Monday that he was going to Russellville and was going to buy this Thomas farm for Ben if it didn't go too high. He told them that Ben liked the place and his family liked it, and they wanted it for a home. Appellant and Ben Oakes attended the sale and the property was knocked down for $1,560.00. They returned to their homes after the sale. The widow of Ben Oakes testifies that Monroe then told her Ben had got the place and said he "thought he got it cheap" and was "glad we got it." Mack Oakes in his testimony said: "I suppose Monroe told me twenty times it was bought

for Ben, and that he had bought it for Ben, and he never did claim that place until this suit was brought.'' Butler Oakes testified that he and his brothers had agreed that Ben could buy this Thomas place a great deal cheaper than he could build, and agreed that Monroe should do the bidding, that he saw his brother, Monroe Oakes, shortly after his return from Russellville, and that Monroe said to him, ''We got the place.''

Mr. C. E. Cornett testified that he saw Mr. Monroe Oakes a few days after this place had been sold and he told him he understood he had bought the property, and Monroe Oakes said: ''Yes, sir, I bought it for Ben.'' The proof shows that this farm was known as the Ben Oakes farm, and that he lived on it, claimed it as his own, worked it, fenced it, improved it, built on it a barn and a tenant house, planted an orchard, and openly exercised every act of ownership over it from its purchase until he was killed. The evidence shows that Monroe Oakes often spoke of this Thomas farm as ''Ben's place.'' Monroe Oakes never demanded or received any rent for this farm or any portion of the crops grown on it. Monroe and his sister, Mrs. Smith, passed the place one day and he pointed to the place and said: ''Ben is not taking care of his place as he should.''

C. E. Cornet, who had come to Logan county when he was eighteen years old and had lived about a mile from this Thomas place for sixty-nine years, testified that after purchasing this property Ben Oakes occupied it continuously until his death, claiming and cultivating it as his own.

No one seems to have ever suspected that this farm did not belong to Ben Oakes until about the year 1913, when Monroe Oakes sold a portion of the land belonging to Ben Oakes to a negro. Ben Oakes saw the negro at work on the land and drove him off, and when investigating the matter of the negro's purchase, he found that this Thomas farm, instead of being deeded to him, was deeded to Monroe Oakes. He now began suit against Monroe Oakes to settle their partnership affairs and to establish and quiet his title to this Thomas farm. While that suit was pending, the negro, whom he had driven off the farm, returned and killed Ben Oakes. For some reason, not disclosed, the Oakes family blamed Monroe Oakes for Ben's death, and Monroe Oakes testifies that none of them would speak to him. The testimony of the sister, Mrs. Smith, was that Monroe took his stand on the side

of the negro, and that they received information that Monroe helped to employ counsel to defend this negro for killing his brother. After the death of Ben Oakes the suit he had begun against Monroe Oakes was revived. The court settled their partnership matters but dismissed the suit without prejudice, so far as this Thomas farm was concerned.

On the 16th of December, 1918, Monroe Oakes instituted this suit against the widow and children of Ben Oakes to recover this farm, and filed with his suit, as an exhibit, a deed executed to him and recorded in 1886, conveying him this farm.

The appellees contend that this farm was bid in by L. M. Oakes for Ben Oakes, that it was paid for by Ben Oakes, and that the title was taken to L. M. Oakes without the knowledge or consent of Ben Oakes.

The testimony of Monroe Oakes is very unsatisfactory. Instead of giving it in a concise, connected, straightforward way he hesitates, and his testimony is brought out by questions often either leading or suggestive, one hundred and four out of the one hundred and eighty-one questions propounded to him on his direct examination being of that kind. If any objection was made to these questions, the record before us does not disclose it, hence it must be now treated as waived. Nevertheless, testimony thus brought out can have but little weight in any court, and if litigants, testifying for themselves about important matters, compel their counsel to resort to this sort of questioning in order to bring out what they know, they need not be surprised when it is given but little credence. The evidence required to establish a trust as in this case must, as said in Neel's Exor., et al. v. Noland's Heirs, 166 Ky. 455, be clear and convincing; that does not mean, however, that it must be entirely free from contradictions. See Roche v. Roche, 188 Ky. 327. The trial court was not favorably impressed by the evidence introduced by appellant, for that court dismissed appellant's petition and quieted the title in the appellees. This court is primarily constituted to pass upon questions of law. It is often difficult, if not impossible, to convey to an appellate court, by way of a dry record and brief, the true force and effect of evidence and the character and integrity of the witnesses.

Every presumption is in favor of the correctness of the decision of the trial court, and in order to warrant a reversal error must affirmatively appear from the record.

This presumption is one with which this court begins its examinations of every case brought before it, and one which every appellant must overcome in order to secure a reversal of a judgment. In other words, the burden is on the appellant to show error affecting the judgment rendered below.

With these well established rules before us, we are compelled to order that the judgment be affirmed.