Milton W. KEENEY; Ruth Keeney; Robert Wayne Keeney, Admin. of the Estate of Winfred D. Keeney; Drusilla K. Weddle; and Fontalla Keeney, Appellants/Cross–Appellees

v.

Barbara Joanne KEENEY, Appellee/Cross–Appellant.

Nos. 2005–CA–001834–MR, 2005–CA–001877–MR.

Court of Appeals of Kentucky.

March 16, 2007.

Discretionary Review Denied by Supreme Court June 13, 2007.

Marcia A. Smith, Corbin, KY, for appellants/cross-appellees.

Dale B. Mitchell, Somerset, KY, for appellee/cross-appellant.

Before ACREE, and TAYLOR, Judges; KNOPF,[1] Senior Judge.

## OPINION

ACREE, Judge.

This appeal from a judgment entered by the Pulaski Circuit Court began as Barbara Joanne Keeney's petition for dissolution of her marriage to Milton Keeney. Barbara amended her petition to name as additional defendants Milton's parents, Winfred (now deceased) and Ruth Keeney, and to establish her rights to 6.6629 acres near Nancy, Kentucky, titled in Winfred's and Ruth's names. The parties and trial court refer to this property as the "Nancy property" or, more frequently, the "Barlow property." Having concluded that the findings of the trial court were not clearly erroneous and that it correctly applied the law, we affirm.

Essential to Barbara's claims is the premise that Milton, aided by Winfred and Ruth, intentionally avoided direct ownership of real and/or personal property in his name. The obvious purpose was to avoid, and in fact, to defraud at least one particular creditor who was in a position to execute on any property she could have found belonging to Milton. As it happens, Milton was involved in a two-vehicle accident in the early 1970s when he was 18 years old.[2] The other driver, Mary Jean Smith, obtained a civil judgment (Smith judgment) against Milton. At the time of the accident, Milton lived at home with his parents, attended community college, did some work on his father's farm, but was not self-supporting. Despite the passage of more than thirty years, the Smith judgment has never been satisfied.

---

1. Senior Judge William L. Knopf sitting as Special Judge by assignment of the Chief Justice pursuant to section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

2. *See Keeney v. Smith,* 521 S.W.2d 242 (Ky. 1975).

On June 22, 1982, a decade or so after Milton's accident, Barbara and Milton were married. Before and during their marriage, Milton was self-employed. He had begun and continued establishing a business known as K–Bar Trailer Manufacturing Company. He built cattle, horse, and flat bed trailers. Additionally, Milton started a pig farm, but that venture eventually failed.

Barbara worked with her husband on many of his K–Bar ventures. She aided in K–Bar's record keeping and also helped with the pigs at Milton's failed pig farm. The trial court found that "Barbara expended a significant amount of time in labor to upgrade and build the business known as K–Bar."

Not long after their marriage, in February of 1983, and without Barbara's knowledge, Milton and his father attended a real estate auction where they were the successful bidders to purchase the Barlow property. Their winning bid was $61,700. When deposed, neither Milton nor his father could or would testify clearly as to which of them did the actual bidding. The court noted that Milton's testimony on this point was "ambivalent."

Their testimony regarding who paid for the property was hardly less evasive. Milton testified that he went to the auctioneer's office immediately after the auction and paid the down payment for the property using monies from the K–Bar account. However, Winfred contradicted that testimony, stating nothing had been paid for the property on the day of the auction.

Very clear and uncontradicted is the trial court's finding of fact that the purchase price of $61,700 was paid directly from the K–Bar checking account, an account with Mutual Federal Savings and Loan Association (Mutual Federal) and the only checking account Barbara or Milton owned. Barbara testified and introduced into evidence two checks drawn on the K–Bar account and made payable to Samuel Ray Godby, the realtor who conducted the auction. The first check, dated February 12, 1983, was in the amount of $9,255 and contained the notation "15% on Tracts 1–2–3–4 Sam Barlow." The second check, dated March 14, 1983, in the amount of $52,445, bore the notation "Tract # 1 Sam Barlow property." Both checks were signed by Milton.

Despite the fact that the funds to purchase the Barlow property came from Milton and Barbara's K–Bar checking account, the property was deeded to Winfred and Ruth. When Winfred was asked, "[H]ow did Mr. Barlow get paid for that property?" he responded, "I couldn't tell you exactly[.]" He later changed his story, however, and said the property was paid for by the rent he received from Barbara and Milton but, he added, "Barb didn't know nothing about our deal[.]"

The "deal" to which Winfred referred several times in his deposition included, according to Winfred, making arrangements with Mutual Federal "for Milt to do business and live and make a living[.]" That deal, which existed throughout Barbara's marriage to Milton, involved a series of property acquisitions, loans and mortgages designed to avoid public records that would identify Milton as a property owner.

On December 10, 1982, two months before the auction, Winfred and Ruth executed a mortgage with Mutual Federal on a different parcel of real estate (referred to in the record as the "Naomi property") to "serve as collateral for any promissory notes executed by Milton W. Keeney, not to exceed Fifty Thousand ... Dollars[.]" Winfred indicated in his deposition that the proceeds from one or more of these promissory notes was the source of the

funds deposited into the K–Bar account to pay for the Barlow property.

On March 14, 1983, the date Milton made the final payment to purchase the property, Winfred and Ruth executed a mortgage on the Barlow property in favor of Mutual Federal. The mortgage indicates it secured payment of a $52,000 note with a maturity date of six months. Because the note is not in the record, we do not know who actually signed the note and became obligated to repay the loan. Winfred did not recall signing the note and we cannot assume that he or Ruth did sign it. The record reflects that Mutual Federal, obviously aware of at least part of the "deal," had an arrangement with Milton and his parents that allowed Milton to borrow money on the strength of the security of real estate titled to his parents. Evidence of this arrangement can be found in Milton's parents' mortgage of the Naomi property for Milton's benefit in December 1982. It can also be found in a November 6, 1985, note signed only by Milton in the amount of $89,960, secured by another mortgage on the Naomi property, in the same amount, also dated November 6, 1985, executed only by Winfred and Ruth. We do know from Winfred's testimony that neither Winfred nor Ruth paid any amount toward satisfaction of any of the notes secured by these various mortgages.

As indicated, Winfred testified that the property was paid for by Milton's and Barbara's rent payments. He also testified, however, that he never personally saw any rent payments. Milton and Barbara made payment directly to Mutual Federal. More accurately then, Milton and Barbara paid off the mortgages that were used as security for the amounts Milton borrowed to pay for the Barlow property. In fact, while Winfred credited his son for paying off the mortgages with

Mutual Federal, he believed "Barbara carried the money up there" to the bank.

In addition to paying off the mortgages, Barbara and Milton also made improvements to the property. Soon after the property was purchased, Barbara and Milton began remodeling the residence located there. The record reflects and the trial court found that Barbara and her family did much of the remodeling work themselves. Additionally, the trial court found that many independent contractors were paid from the K–Bar account for a variety of home improvement services they performed. When the property was adequately remodeled, Barbara and Milton moved in.

Milton never told Barbara exactly how the Barlow property was acquired. Barbara only learned of the auction when David Burnette told her that he had bid against Milton for the Barlow property and lost. The trial court quoted Barbara's testimony that "she was informed by David Burnette that Milton had bought the Barlow property at Nancy." When she confronted Milton about the purchase, he never contradicted David Burnette's characterization of the acquisition. Quite to the contrary, for thirteen years Milton spoke of the property as "theirs" and behaved in a manner that reinforced Barbara's belief that they owned the property as husband and wife. Barbara testified that Milton never told her about his parents' involvement in buying the property prior to her filing for divorce. Winfred's testimony that, "She didn't know nothing about our deal," supports Barbara's contention.

Barbara and Milton separated in January 1995. She filed for divorce on April 17, 1995. It was not until then that Milton represented to Barbara that his parents actually owned the Barlow property. On July 12, 1995, Barbara filed her first

Amended Petition for Dissolution of Marriage joining Winfred and Ruth in the action. Barbara alleged that Winfred and Ruth placed the Barlow property in their names to help Milton avoid execution of the Smith judgment against any asset Milton beneficially owned. She asked that the court impress a trust upon the property for the use and benefit of herself and Milton.

In her Petition, Barbara also claimed she was entitled to one-half the proceeds from Milton's recent sale of K–Bar's inventory. On May 2, 1995, approximately two weeks after Barbara filed for divorce, Winfred wrote a check to Mutual Federal in the amount of $12,423.45. This amount satisfied one of the notes Milton had executed. Winfred indicated on the check that it was for "K–Bar Inventory." The transaction conveying the inventory from Milton to Winfred and Ruth was memorialized by a "Contract and Bill of Sale" also dated May 2, 1995. Two months later, on July 3, 1995, this same inventory appraised for only $8,710. The trial court said:

> This Court finds it ironic that items that appraised for the sum of $8,710.00 were sold prior to the time of the inventory for the sum of $12,423.45. This transaction strains the credulity of the individuals involved with this Court. This Court finds that this transaction was made for the purpose of defeating Barbara of any interest in the property.

In its Order, entered December 9, 2004, the Pulaski Circuit Court addressed both issues. The court concluded Barbara was unaware that the Barlow property was placed in the name of Winfred and Ruth. To the contrary, the court found that Barbara "was informed ... that Milton had bought the Barlow property at Nancy" and that the property was paid for with funds from the K–Bar checking account controlled by Milton. The trial court ruled "as a matter of law that clear and convincing evidence [was] presented warranting the imposition of a constructive trust on the 'Nancy or Barlow Property.' " The court also ordered the property to be sold and the proceeds divided equally between Barbara and Milton. Regarding Milton's sale of the K–Bar inventory, the court awarded Barbara $6,211.72 as her portion of the personal property sold. This appeal followed.[3]

In actions tried upon the facts without a jury we review the court's findings under the clearly erroneous standard set forth in Kentucky Rules of Civil Procedure (CR) 52.01. *Largent v. Largent*, 643 S.W.2d 261, 263 (Ky.1982). This rule provides in pertinent part that findings of fact shall not be set aside unless clearly erroneous and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. *Id.* With regard to the trial court's application of law to those facts, we engage in a *de novo*

3. On December 17, 2004, Barbara filed a Motion to Alter or Amend the December 9, 2004 Order, stating that the Court's decision was inconsistent because in one part of the Order the Court stated the Barlow property should be subject to a "constructive trust," whereas in another section of the Order the Court ordered that the property was subject to a "resulting trust." Barbara also noted that she had moved for attorney's fees and the Court had not ruled on this issue. By Order entered February 14, 2005, the December 9,

2004 Order was amended to reflect that a constructive trust, rather than a resulting trust was imposed. The Court also amended the Order to state that it was not final and appealable until the issue of attorney's fees had been decided. On August 8, 2005, Barbara withdrew her Motion for Attorney Fees and requested that the Court make a final and appealable Order. On August 9, 2005, the Court entered an Order making its December 9, 2004 Order and its February 9, 2005 Order final and appealable.

review. *Rehm v. Clayton*, 132 S.W.3d 864, 866 (Ky.2004).

Appellants present two arguments on appeal. First they argue that the facts do not support the trial court's imposition of a constructive trust. Second, they claim the trial court erred by finding Barbara was entitled to half the proceeds of the K–Bar inventory sold by Milton to his parents with the proceeds applied directly to an indebtedness at Mutual Federal. We disagree with both arguments.

In summary, the Appellants herein first make the same argument presented by the appellants in *Fresh v. Dunakin*, 306 Ky. 87, 206 S.W.2d 203 (1947). They assert the trial court erred because "a constructive trust must result from an act of fraud, or, in the absence of fraud, must grow out of a fiduciary relationship." *Id.* at 205. We reiterate what our predecessor court said in response to that argument.

> Appellant's statement of the rule substantially is correct, but is not sufficiently elaborate for our consideration of it in the light of the facts presented by this record. The rule perhaps is best stated in *Moore, et al. v. Terry, et al.*, 293 Ky. 727, 170 S.W.2d 29, 32 [ (1943) ], wherein, after citing authorities, the Court said:
>
>> "These texts and authorities state the rule to be that a constructive trust is created by equity regardless of any actual or presumed intention of the parties to create a trust where the legal title to property is obtained through fraud, misrepresentation, concealment, undue influence or taking advantage of one's weakness or necessities, *or through similar means or circumstances rendering it unconscionable for the holder of the legal title to retain the property.*"
>
> *Id.* (emphasis added).

■ When legal title to property has been acquired or held under such circumstances that the holder of that legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee. *Middleton v. Beasley*, 186 Ky. 252, 216 S.W. 591, 592 (1919) (citations omitted). Constructive trusts are created by the courts "in respect of property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it." *Hull v. Simon*, 278 Ky. 442, 128 S.W.2d 954, 958 (1939); *see also, O'Bryan v. Bickett*, 419 S.W.2d 726, 728 (Ky.1967). "The fraud may occur in *any form of unconscionable conduct;* taking advantage of one's weaknesses or necessities, or in any way violating equity in good conscience." *Kaplon v. Chase*, 690 S.W.2d 761, 763 (Ky.App.1985)(emphasis added), *citing St. Louis and S.F.R. Co. v. Spiller*, 274 U.S. 304, 47 S.Ct. 635, 71 L.Ed. 1060 (1927). In fact, a court exercising its equitable power may impress a constructive trust upon one who obtains legal title, "not only by fraud or by violation of confidence or of fiduciary relationship, but *in any other unconscientious manner,* so that he cannot equitably retain the property which really belongs to another[.]" *Scott v. Scott*, 183 Ky. 604, 210 S.W. 175, 176 (1919)(emphasis added). Similarly we have said that a constructive trust may be imposed where title is taken under "circumstances of circumvention [or] imposition[.]" *Middleton*, 216 S.W. at 592.

■ It is true, despite cases to the contrary such as *Scott, supra*, that Kentucky courts have required the party seeking the imposition of a trust to establish a "confidential relationship" with the party upon whom the trust is to be imposed. *See, e.g., Panke v. Panke*, 252 S.W.2d 909, 911 (Ky.1952). Where it is deemed necessary, however, "[t]he existence of the relationship in any particular case is to be

determined by the facts established." *Henkin, Inc. v. Berea Bank & Trust Co.,* 566 S.W.2d 420, 423 (Ky.App.1978). Furthermore, "[t]he tendency of the courts is to construe the term 'confidence' or 'confidential relationship' liberally in favor of the confider and against the confidant, for the purpose of raising a constructive trust on a violation or betrayal thereof." *Appleby v. Buck,* 351 S.W.2d 494, 496 (Ky.1961) (citation omitted).

■ All of these considerations are factual in nature to be determined by the trier of fact whose findings will not be disturbed by this court unless the, conclusion could not reasonably have been drawn. *Roche v. Roche,* 188 Ky. 327, 222 S.W. 86, 88 (1920)("[T]he evidence authorizing the establishment of a trust must be clear and convincing." Yet it is a "well-recognized rule that the findings by the chancellor will not be disturbed unless they are against the preponderance of the evidence[.]"); *see also Oakes v. Oakes,* 204 Ky. 298, 264 S.W. 752, 753 (1924)("[E]vidence required to establish a trust as in this case, must ... be clear and convincing. That does not mean, however, that it must be entirely free from contradictions."). These common law standards were perforce subsumed by our procedural rule, cited *supra,* that where the trial court sits as fact-finder, as in this case, "[f]indings of fact shall not be set aside unless clearly erroneous." CR 52.01.

■ A careful review of this matter indicates there is no reason to believe that the circuit court was clearly erroneous in any of its findings of fact. The collaboration of Milton and his parents to avoid execution of the Smith judgment unquestionably falls in that category of behavior described variously in our caselaw as "unconscientious," "unconscionable," and "violating equity in good conscience." These were certainly "circumstances of circum-

vention[.]" Winfred's and Ruth's efforts to hide Milton's beneficial ownership of property from Mary Smith had an obvious and even greater dispossessory effect on Barbara than it had on its target.

Even if defrauding Barbara of her beneficial interest was not Winfred's and Ruth's original intention, it became so when she decided to divorce their son. Their retention of the property thus deprived Barbara of her beneficial ownership of the marital residence. *See Kaplon,* 690 S.W.2d at 763 (Even where a property is originally acquired in the absence of fraud toward the beneficial owner, a constructive trust will be imposed where "it is against equity that it should be retained by him who holds it."), *quoting Hull,* 128 S.W.2d at 958.

The reason it is against equity to allow Winfred's estate and Ruth to retain this property as their own is obvious. Winfred and Ruth paid nothing for the property. True, they offered up security for loans to purchase the property, but Milton and Barbara, not Winfred and Ruth, paid off those loans. As the trial court found, it was "from their [Milton's and Barbara's] joint efforts all mortgage obligations were paid by them." If the trial court had not imposed a constructive trust, Winfred's estate and Ruth would have been unjustly enriched, *Henkin,* 566 S.W.2d at 423, not only because they never paid for the property, but also because Barbara and her family contributed substantially to its improvement. Our predecessor Court of Appeals said a party's retention of property rightfully belonging to the beneficial owner,

> resulting in [that party's] unjust enrichment, cannot be regarded as rightful nor its refusal of restitution sanctioned as consonant with equitable principles of fair and just dealing....

Under such circumstances equity should impose upon the [party], even though *in invitum*, a constructive trust in favor of the wronged [beneficial owner.]

*McCracken Co. v. Lakeview Country Club*, 254 Ky. 515, 70 S.W.2d 938, 941 (1934).

▇ To the extent Appellants base their argument against imposition of a constructive trust on the absence of a fiduciary or confidential relationship between Milton's parents and Barbara, we would disagree. As noted, *supra*, courts construe "confidential relationships" liberally. Kentucky courts have found a confidential relationship to exist between step-father and step-daughter, *Kaplon v. Chase*, 690 S.W.2d 761, 763 (Ky.App.1985), and recognized such a relationship could exist even between two people who were " 'close associates, neighbors and friends in the years past.' " *Security Trust Co. v. Wilson*, 307 Ky. 152, 210 S.W.2d 336, 339 (1948), *quoting Small v. Dorsett*, 223 N.C. 754, 28 S.E.2d 514, 518 (1944). The relationship between a father-in-law and daughter-in-law would seem to fall between the two. Such a confidential relationship would certainly appear to exist under the facts of this case which include Winfred's uncontradicted testimony that in their community, "the men take care of the business."

Barbara confided in her husband, of course, but also had placed confidence and reposed trust in her father-in-law. For example, when it came time to pay the property taxes on the Barlow property, Winfred eased Barbara's concern. According to Winfred, every year Milton would convey the tobacco base allocated to the Barlow property to Winfred so he could combine it with his own and lease it together to be farmed by a third party. In exchange, Winfred would pay the property taxes that Barbara believed she owed. Obviously, she believed she owed the taxes because she believed she and Milton owned the property. As Barbara testified,

Winfred said that, you know, said that's the way, what they'd do and that's what happened, so we never did pay the taxes on the place. Every year Milton signed it [rights to the tobacco base] over like that and that's how the taxes got paid.

Of course, because the property was titled to Winfred and Ruth already, going through such an exercise would have been meaningless. Nevertheless, Milton testified that that is exactly what they did.

Q: Did you ever go to the tobacco office [ASCS office] in order to release that to anyone else?

A: Yes I did.

Q: And did you sign for the release of that tobacco allotment?

A: Yes I did.... I had to release it back to my dad.

To the extent that the impression of a constructive trust necessitated finding the existence of a confidential relationship between Barbara and Winfred, we cannot say that the trial court was clearly erroneous.

▇ Much of the evidence in this case was conflicting. Often the Appellants' evidence was self-contradictory, as when Milton, upon being asked whether he paid off the mortgages, responded, "I might have and I might not have." We are compelled to give due regard "to the opportunity of the trial court to judge the credibility of the witnesses." CR 52.01. Furthermore, we are prohibited from substituting our judgment for that of a trial court sitting as finder of fact, even where much of the testimony is presented to the trial court by deposition. *Gomez v. Gomez*, 168 S.W.3d 51, 54 (Ky.App.2005).

In this case, the trial court found that Winfred and Ruth placed the Barlow property in their names to conceal the identity

of the beneficial owners; that Barbara and Milton were the beneficial owners of the subject property; that Barbara and Milton paid for the property; and that Winfred (or Winfred's estate) and Ruth would be unjustly enriched by retaining it. We cannot say that the circuit court's creation of a constructive trust, or its finding of any of the underlying facts necessary to support it, are clearly erroneous.

Because the trial court determined it appropriate to establish a constructive trust and not a resulting trust, the Appellants' arguments relative to the latter are unhelpful. Barbara's "protective" cross-appeal, urging us to find a resulting trust in the event we reverse the trial court's finding of a constructive trust, is similarly unhelpful and made irrelevant by our decision.

The Appellants lastly argue that the trial court erred in awarding Barbara half the proceeds from the sale of the K–Bar inventory and equipment. They contend that the sale was made for the purpose of satisfying a marital debt and that there was no evidence that the debt was anything other than a marital debt. However, the opposite contention can be made, that Appellants presented no evidence either that the debt was a marital debt or as to the date it was created. We again defer to the trial court's findings, as that court was in a better position to weigh the evidence than this court. Without any evidence to the contrary, the trial court decided that it was not a marital debt. *Neidlinger v. Neidlinger*, 52 S.W.3d 513, 522–23 (Ky.2001)(In the absence of statute, there is no presumption regarding whether a particular debt is a marital debt.). From our review of the record, we cannot say that this determination was clearly erroneous.

The trial court also found that Barbara's investment of time and labor contributed toward the building of K–Bar as a business and entitled her to an interest in the business' inventory and equipment. Having found the K–Bar inventory to be marital property, the trial court was well within its authority to award Barbara half of the proceeds of the sale of that inventory. *See* KRS 403.190(1). We see no basis for finding that the trial court's findings or rulings on this issue were clearly erroneous.

For the foregoing reasons, the Findings of Fact, Conclusions of Law and Order of the Pulaski Circuit Court, entered December 9, 2004, as amended by that court's Order entered February 14, 2005, and made final by Order entered August 9, 2005, is affirmed.

ALL CONCUR.