Cheryl **GOMEZ**; Catesby Woodford, Individually; Miller, Griffin & Marks, PSC, Appellants,

v.

Eduardo Roman **GOMEZ**, Appellee.

No. 2004–CA–000432–MR.

Court of Appeals of Kentucky.

July 8, 2005.

---

13. *Id.* at 478.      14. *Id.*

**52**

Thomas W. Miller, Catesby Woodford, Susan Y.W. Chun, Lexington, KY, for Appellant, Cheryl Gomez.

Melinda Gillum Dalton, Somerset, KY, for Appellee.

Before BARBER and JOHNSON, Judges; HUDDLESTON, Senior Judge.[1]

## OPINION

BARBER, Judge.

This appeal calls into question the Pulaski Circuit Court, Family Court Division's valuation of Eduardo Roman Gomez's (Eduardo) radiology practice, the amount of maintenance awarded to Cheryl Gomez (Cheryl), the allocation of a marital debt to Cheryl, and the amount of Cheryl's attorney's fees for which Eduardo should bear responsibility. We reluctantly affirm the court's ruling as to the valuation of Eduardo's medical practice and vacate and remand with respect to all other issues.

Cheryl and Eduardo were married June 2, 1985, but lived together for two years prior to that time. They separated in July 2000 and the court entered a decree of dissolution of the marriage on May 21, 2003 reserving all other issues. Prior to the marriage Cheryl had worked as a registered nurse, but after the birth of their daughter in 1988 and their relocation to Somerset, Kentucky from Miami, Florida Cheryl has not been employed. Instead she has chosen, presumably with the blessing of Eduardo, to raise their daughter, be a homemaker, and participate in various charitable activities—some no doubt designed to further her husband's career.

When the Gomez's relocated to Kentucky Eduardo became employed by an entity now known as Bluegrass Radiology Associates, Inc. (Bluegrass Radiology). In 1995 Eduardo became a partner in Blue-

---

1. Senior Judge Joseph R. Huddleston sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

grass Radiology and in the three years preceding the divorce he grossed between $600,000.00 to $800,000.00 per year. At the time of the dissolution of the parties' marriage Eduardo remained a shareholder in Bluegrass Radiology and owned a 1/3 interest.[2]

Eduardo's level of income allowed the Gomez's to live an extremely comfortable lifestyle. The testimony and other papers filed in the case show that the parties owned two Mercedes, a Toyota Landcruiser, and a Porsche. Cheryl testified that vacations were frequent and during the marriage the family traveled extensively. The Gomez's owned a nice home and employed individuals to perform cooking, housework, grounds keeping, pool cleaning, and mowing. Cheryl regularly received massages. The parties ordered organic food and meat from specialty sources. Their daughter had a nanny. They owned a condominium in Florida and were members of the local country club.

It is undisputed that Cheryl had control of paying the parties' bills. It is also undisputed that Cheryl discussed financial matters with Eduardo and he did not question her decisions.

Despite Eduardo's considerable income, the Gomez's assets were rather heavily encumbered. Cheryl touched on this fact in her deposition testimony stating that some of their financial situation had been planned (such as the two mortgages on their home in Somerset, one with a balloon payment) to receive a low interest rate along with tax advantages. The plan was to pay these obligations off within a specific, relatively short, time period.

Prior to trial the parties participated in mediation. As a result of mediation the parties agreed to share joint custody of their daughter, for Eduardo to pay $3,000.00 per month in child support and for Eduardo to retain their daughter on his health insurance. The trial court subsequently ordered child support to continue until age 18, or, if the child was still in high school at that age until the age of 19, and for Eduardo to provide the child's health insurance until the child's majority not to exceed age 25. Extraordinary medical expenses were to be shared.

The parties also agreed to divide certain items of their marital estate as follows: Each agreed to keep the furnishings currently in their possession. The Linwood Drive home was to go to Cheryl. Its value was set at $200,000.00 with a net equity of $28,437.00. The Glendale home went to Eduardo with a value of $150,000.00 and net equity of $19,000.00. The Florida condominium was retained by Cheryl with net equity of $4,580.00. A 1997 Mercedes and a Porsche were to be sold with the proceeds divided equally. Cheryl kept a 1999 Landcruiser while Eduardo kept a 2001 Mercedes, each to hold the other harmless on the outstanding debt.

Cheryl and Eduardo kept the checking accounts in their own name and agreed to equally divide an account with Edward Jones with a value of $17,442.00. Finally, Cheryl and Eduardo agreed to equally divide their retirement accounts, Eduardo's having a value of $503,824.32 and Cheryl's a value of $61,211.00.

Eduardo also agreed to continue to pay the first and second mortgage on the Linwood home, the amounts to be considered maintenance. Payment of the first and second mortgage by Eduardo terminate when his maintenance obligation termi-

---

**2.** After the marriage was dissolved another radiologist joined the practice as a shareholder, thus, Eduardo's interest then became ¼.

nates. Cheryl agreed to pay the indebtedness on the Florida condominium and not claim that amount as a factor in her request for maintenance.

This review of the evidence shows that Cheryl and Eduardo agreed to a roughly equal division of property.

What Cheryl and Eduardo could not agree to was the value to be attributed to Eduardo's practice, the amount and duration of maintenance, the allocation of a $52,000.00 credit card debt, and whether Eduardo should be responsible for Cheryl's attorney's fees and expert witness fees. These matters were referred to the court for decision.

In its amended decree of dissolution the court found that Eduardo's share of Bluegrass Radiology was worth $106,284.00 and directed him to pay Cheryl half that amount in increments of $1,500.00 until paid in full. This value was based on the expert witnesses of Eduardo who attributed no goodwill value to the practice and calculated his share of the practice based solely on book value.

As to maintenance the court ordered Eduardo to pay $5,000.00 per month for 3 years. It noted that this was in addition to the amounts payable for the first and second mortgage on the Linwood home (approximately $2,424.00 per month) and that Cheryl had been receiving temporary maintenance since May 2001 of $4,150.00 per month.

The court found insufficient credible evidence introduced to support Cheryl's claim that a $52,000.00 credit card debt was a joint obligation. Instead, it ordered Cheryl to be responsible for the full amount.

The court ordered Eduardo to pay $12,000.00 of Cheryl's attorney fees and $1,000.00 of her expert witness fees. Cheryl represents this amount to be 22% of the total fees owing by her and Eduardo does not dispute that calculation.

The first question for our consideration is the appropriate standard of review. Cheryl argues because the case was decided under CR 43.04(1) which allows trials by deposition, this Court is in just as good a position to judge the credibility of the witnesses and weight of evidence as the trial court. Therefore, she argues we should not give the trial court's ruling any deference but, instead, conduct a *de novo* review. Eduardo maintains the appropriate standard for review is under CR 52.01, the clearly erroneous standard.

We will allow that there is some ambiguity in this area of the law. *Largent v. Largent,* 643 S.W.2d 261, 263 (Ky.1982) holds that the clearly erroneous standard of CR 52.01 applies to cases tried solely by deposition. *See also Vanover–May v. Marsh,* 793 S.W.2d 852, 854 (Ky.App.1990). However, in *Reichle v. Reichle,* 719 S.W.2d 442, 444 (Ky.1986), the Supreme Court stated:

CR 43.04 provides that certain types of cases may be tried by deposition. Obviously, under such circumstances the trial judge does not have an opportunity to judge the credibility of the witnesses on the basis of physical appearance in court. The "clearly erroneous" standard is sufficiently broad to permit the reviewing court to adopt a method of review which best fits the questions involved and the particular facts in a specific case. The appellate court should review each case according to what is most appropriate under the specific circumstances. The fact that part of the proceedings before the trial court are taken by means of deposition does not permit the reviewing court to conduct a *de novo* consideration of the facts and it does not allow the reviewing court to

substitute its judgment for that of the original finder of fact.

The above-quoted language and sentiment from *Reichle* is repeated in *Commonwealth v. Harrelson,* 14 S.W.3d 541, 548 (Ky.2000). Even though this language may suggest that an appellate court can fashion a method of review fitting to the situation, it is clear from other language in the case that the standard does not allow for a *de novo* review nor for this Court to substitute its judgment for that of the trial court. *Reichle, supra* 719 S.W.2d at 444 & 445.

■ A major point of contention between the parties is the value of Eduardo's radiology practice. Eduardo's experts valued his interest in Bluegrass Radiology at just over $100,000.00. Their calculation did not include an amount for goodwill. Cheryl's expert, on the other hand, put the value of Eduardo's interest at $932,880.00. This included a calculation for goodwill based on the capitalization of excess earnings approach. On appeal Cheryl argues it was reversible error for the court to attribute no goodwill value to Eduardo's interest.

In *Heller v. Heller,* 672 S.W.2d 945, 947 (Ky.App.1984), it was held the goodwill contained in a business should be considered when arriving at the value of a practice. In *Heller* the business was an accounting practice. The Court did not rule that all businesses have goodwill. The evidence in that case established the accountant had purchased an accounting practice from the estate of a former accountant and had paid in that price a component of goodwill. *Id.* at 947–948. Therefore, the only question presented by the case was whether the trial court had erred by refusing to consider the accounting practice and its goodwill as marital property. This Court held it to be error. *Id.* at 947.

The seminal case in Kentucky on valuing a professional practice is *Clark v. Clark,* 782 S.W.2d 56 (Ky.App.1990). That case discussed at length the task of properly valuing a professional practice for dissolution purposes and concluded the use of the capitalization of excess earnings method to value the husband's medical practice was an acceptable approach. *Id.* at 60.

Cheryl contends the trial court erred by not following this method, the one adopted by her expert, to value Eduardo's interest in Bluegrass Radiology. But, *Clark* does not require a trial court to use the capitalization of excess earnings method. It was noted in *Clark* that a trial court's ruling as to valuations in a dissolution action will not be disturbed on appeal unless clearly contrary to the evidence submitted. *Id.* at 58–59. It set the task of the appellate court to determine whether the trial court's approach fairly estimated the value of the business and the individual's interest. *Id.* at 59.

After determining the trial court appropriately used the capitalization of excess earnings approach in the case the Court stated:

> There is no definitive rule or best method for valuing goodwill. (Citations omitted.) The determination of goodwill is a question of fact rather than law, and each case must be determined on its own facts and circumstances.

*Id.* at 60.

The position of the *Clark* court is in the majority of those who have considered the question of valuing goodwill in a professional practice. However, we believe it is also fair to say that courts across the country have struggled with the issue and many different formulations for trying to reach a fair and equitable disposition of the marital estate have been upheld. *See e.g.* Martin J. McMahon, Annotation, 78

A.L.R.4th 853 *Valuation of Goodwill in Medical or Dental Practice for Purposes of Divorce Court's Property Distribution* (1990); Martin J. McMahon, Annotation, 76 A.L.R.4th 1025 *Divorce and Separation: Goodwill in Medical or Dental Practice as Property Subject to Distribution on Dissolution of Marriage* (1989). *Clark* itself recognizes this by requiring the trial court's judgment of a business' value reflect reality, but not requiring a particular methodology to reach that conclusion. *Clark, supra* 782 S.W.2d at 60.

In this case the trial court found the practice of Bluegrass Radiology with respect to those physicians entering or exiting the practice to be significant. Eduardo testified and submitted affidavits from other physicians who had left the practice that when a physician joined or left the group an evaluation of the current accounts receivable was done. Based on that value a physician entering or leaving the practice had to pay or was paid a percentage of the accounts receivable value. No calculation for goodwill was included. The trial court found this evidence to be persuasive along with evidence that when the group had discontinued its practice at another hospital it did not receive any payment for goodwill.

■ The description of how the practice had historically valued itself is, in essence, a buy-sell agreement. And while buy-sell agreements or corporate by-laws have been rejected as the basis for valuing a professional practice where this would not accurately reflect the value of the business, *Clark, supra* 782 S.W.2d at 60, they may be used as a factor in reaching a determination regarding the value of a professional business. *Drake v. Drake,* 809 S.W.2d 710, 713 (Ky.App.1991).

We disagree with the trial court's conclusion that the type of practice engaged in by Bluegrass Radiology, which is a hospital based practice with no patient list or patient contact, is so dissimilar from the practice considered in *Clark* as to justify attributing no goodwill to Bluegrass Radiology. Other courts giving their attention to practices with such characteristics have found goodwill measurable. *See e.g. Nehorayoff v. Nehorayoff,* 108 Misc.2d 311, 320–321, 437 N.Y.S.2d 584 (1981)(abortion clinic has goodwill); *Geesbreght v. Geesbreght,* 570 S.W.2d 427, 434 (Ct. of Civ. App. Tex.1978)(emergency room practice has goodwill value). *See also, Clark, supra* 782 S.W.2d at 60 ("The difficulty of valuing goodwill is not sufficient reason to ignore its existence").

And while we would have reached a different conclusion on the evidence presented in this case, the trial court's determination that no goodwill existed because of the historical way in which the practice valued itself is supported by substantial evidence. Further, a review of the expert testimony in this case reveals that Cheryl's expert's valuation suffered from some problems according to Eduardo's experts. Our task is to determine whether the trial court's finding of fact as to valuation of the business is clearly erroneous. If substantial evidence exists to support the decision, then we are bound to affirm and we do so here.

Cheryl next complains the court's award of maintenance was in error. The court, as stated above, awarded Cheryl $5,000.00 per month for three years. It also ordered Eduardo to pay the first and second mortgages on the Linwood home for the same time frame, as per his mediation agreement, bringing Cheryl's award to $7,424.00 per month for three years.

■ KRS 403.200, in this case, allows the court to order maintenance if it finds that the dependent spouse lacks sufficient property to provide for her reasonable

needs and is unable to support herself through appropriate employment. KRS 403.200(1)(a) & (b). The court found this to be true in Cheryl's case. Once that determination is made various factors are to be considered by the court in setting the amount and duration of maintenance. These include the financial resources of the party, the time necessary to become sufficiently educated or trained to find appropriate employment, the standard of living established during the marriage, the duration of the marriage, the age, physical and emotional condition of the party seeking maintenance, and the ability of the spouse from whom maintenance is sought to meet his reasonable needs. KRS 403.200(2)(a)-(f). A trial court's decision regarding maintenance will not be reversed absent an abuse of discretion. *Powell v. Powell,* 107 S.W.3d 222, 224 (Ky. 2003).

The trial court did not make specific findings as to each of these factors in its decree and amended decree. Instead, it focused on what it perceived as Cheryl's delay in seeking retraining to enter the job force even though she had been receiving temporary maintenance for approximately 8 months.

■ The court is required to consider the factors listed in KRS 403.200(2)(a)-(f) before ordering the amount and duration of maintenance. *Gentry v. Gentry,* 798 S.W.2d 928, 937 (Ky.1990). From the court's order in this case it appears that none of those factors were taken into consideration. This is clearly error.

Further, the recent case of *Powell, supra,* a case very similar factually to the one considered here, would suggest that the amount and duration of maintenance awarded to Cheryl is unjust and an abuse of discretion. The parties in *Powell* had been married 18 years. Cheryl and Eduardo were married for 18 years. Mrs. Powell had been an R.N. but let her license lapse and devoted her time to raising their child. Cheryl is similarly situated.

Dr. Powell grossed close to $600,000.00 just prior to the parties' divorce. Eduardo, the evidence shows, grossed more than Dr. Powell. Although Cheryl could return to work as an R.N. upon reinstatement of her license and earn approximately $40,000.00 a year, there is likely to be limited job opportunities for a 45–50 year-old R.N. who has not practiced the trade in a significant number of years. As the Supreme Court noted in *Powell,* the amount of money that could be earned by Mrs. Powell in one year was about what Dr. Powell would earn in one month. *Powell, supra* 107 S.W.3d at 225. The evidence in this case shows much the same.

The award of maintenance to Cheryl did not consider the standard of living to which the parties were accustomed. It is also clear Eduardo had more than sufficient resources from which to meet his needs and pay an appropriate level of maintenance. *Powell, supra* 107 S.W.3d at 224.

■ Cheryl next complains of the allocation of a $52,000.00 credit card debt as her sole responsibility. The trial court found insufficient evidence to believe that this was a marital debt. The evidence on this issue consisted of Cheryl and Eduardo's testimony. Cheryl testified as to part of the source for the total charges. She stated that at least $18,000.00 of the debt was for two rugs of which Eduardo received one. Both cost the same amount. Eduardo did not deny this and also admitted that there was at least one credit card and the debt was marital. The problem really comes in the fact that Cheryl presented no documentation of the debt.

Cheryl claims that bills were equally available to Eduardo since the card was in his name.

The evidence seems sufficient to support a finding that the debt was marital in nature. However, its allocation should be reconsidered once an appropriate level of maintenance is awarded. It could be that the court could still fairly award the responsibility of paying this debt to Cheryl.

Finally, Cheryl argues the court should have awarded more of her attorney's and expert witness fees. KRS 403.220 allows the court to award a reasonable amount of the requesting party's attorney's fee after considering the financial resources of the parties. The Supreme Court has held that a number of factors go into determining whether and how much of an attorney's fee should be awarded. *Sexton v. Sexton*, 125 S.W.3d 258, 272–273 (Ky.2004). As in *Sexton* we do not know if the court considered any of these factors. *Id.* at 273. Considering the great disparity in income between Cheryl and Eduardo, it would appear appropriate for attorney's fees to be awarded after consideration of the factors explained in *Sexton*.

The judgment of the circuit court is affirmed on the issue of the valuation of Eduardo's share of Bluegrass Radiology. The judgment of the circuit court with regard to maintenance, allocation of marital debt, and attorney's fees is vacated and the case remanded for proceedings consistent with this opinion.

JOHNSON, JUDGE, CONCURS.

HUDDLESTON, SENIOR JUDGE, CONCURS IN RESULT.