RENDERED:  DECEMBER 15, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0532-DG

LISA THIELMEIER                                                            APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                        CASE NO. 2020-CA-0707
JEFFERSON CIRCUIT COURT NO. 17-CI-500023

KENNETH THIELMEIER                                                        APPELLEE

**OPINION OF THE COURT BY JUSTICE LAMBERT**

**AFFIRMING IN PART, REVERSING IN PART, AND REMANDING**

Lisa Thielmeier (Lisa) appeals from a decision of the Court of Appeals which affirmed several Jefferson Circuit Court rulings in a dissolution proceeding between Lisa and her former husband Kenneth Thielmeier (Ken).  After review, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Lisa and Ken met when they were seniors in high school and dated throughout college.  They were wed on July 19, 1985.  At the time, both Ken and Lisa were pursuing post-graduate degrees.  Lisa taught elementary school from 1985 thought 1989, and worked as a guidance counselor from 1990 to 1991.  After the couple's first child was born in 1991, Lisa left the workforce

and did not return. Over the ensuing three decades of marriage, Ken and Lisa had five more children to whom Lisa was a full-time stay-at-home mom.

After completing medical school Ken became an anesthesiologist. In 2008, he began an anesthesiology practice, Anesthesiology Consultants Enterprises, Inc. (ACE) with his partner Dr. Patrick Shanahan (Dr. Shanahan). Being both an owner of and practicing physician for ACE required Ken to work sixty to sixty-five-hour work weeks. ACE proved to be lucrative, and the family lived a very comfortable lifestyle throughout the marriage.

By January 1, 2016, Ken and Lisa considered themselves separated, though Ken was still living in the marital home. On November 8, 2016, Ken filed for a dissolution of marriage, and he moved out of the home on April 1, 2017. At that time, only their youngest child, Samuel, was still a minor. Samuel continued living with Lisa after Ken moved out.

After several years of litigation, the divorce action's two-day trial began on October 3, 2019. On the same morning, the parties entered into a set of agreed stipulations. The stipulations settled several issues leaving only the following, in relevant part, for the court to decide: the division of Ken's ACE 401(k); the valuation of Ken's ownership interest in ACE; the division of Ken's ownership interest in ACE; spousal maintenance; and attorney's fees.

## A. The division of Ken's ACE 401(k).

The parties had a total of five retirement accounts between them. Under their agreed stipulations, four of those accounts were divided equally. The division of the remaining account, Ken's ACE 401(k), was decided by the court.

2

An accounting of Ken's ACE 401(k) contributions and amounts from May 1, 2017, through September 15, 2019, was entered into evidence. The court's findings of fact and conclusions of law stated the following:

> The largest retirement account owned by the parties is Ken's ACE 401(k). According to documents provided to the Court, the balance of the account as of September 15, 2019, was [$1,481,893.25]. It is Ken's request that the ACE 401(k) be divided equally as of May 1, 2017 (shortly after he vacated the marital residence). He would like to be awarded 100% of the contributions into his retirement account from May 1, 2017, to present. He contends that KRS[1] 403.190(1)(a) permits him to retain 100% of the post-separation contributions to his 401(k). This Court agrees.

The court ordered that the ACE 401(k) be equally divided between Ken and Lisa as of May 1, 2017, and that Ken be awarded 100% of the contributions after May 1, 2017.

**B. The valuation and division of Ken's ownership interest in ACE.**

ACE is an anesthesiology group started in 2008 by Ken and Dr. Shanahan. ACE is a closely held professional limited liability company that provides anesthesiology services to one hospital, Audubon Hospital. ACE's exclusive contract for services with Audubon Hospital is the company's only contract, and it is renewed every three years. Without this contract with Audubon Hospital, ACE would have no business and no income. The

---

[1] Kentucky Revised Statute.

company's only assets are its accounts receivable, its cash account, and a few computers.

During the relevant time period in this case, there were seven other doctor-owners of ACE in addition to Ken. Each of those owners have the same employment contract, which contains a buyout clause in the event of voluntary or involuntary termination. As ACE's biggest asset is its accounts receivable, the buyout clause multiplies the net adjusted value of ACE's accounts receivable by the doctor's individual ownership percentage. That amount is then paid out over eighteen months.

The court heard testimony from ACE's business manager, Ryan Nunnelly (Nunnelly),[2] regarding the value of Ken's ownership interest using the buyout clause's formula. On the date Dr. Shanahan retired, June 30, 2018, he and Ken each owned a 26% interest in ACE. Using the buyout clause's formula, Nunnelly opined that on June 30, 2018, Ken's 26% would have rendered a buyout amount of $209,721. This was the same amount paid to Dr. Shanahan when he retired on that date. After Dr. Shanahan retired, his 26% interest was distributed amongst ACE's other owners resulting in Ken's ownership interest increasing to 35.14%. Nunnelly further opined, using the same formula, that a year later on June 30, 2019, Ken's 35.14% interest would have resulted in a buyout amount of $232,720.

---

[2] Nunnelly is not an ACE employee. Nunnelly works for Merrick Management, a professional services organization that ACE contracts with for financial services.

4

The court heard testimony from two other experts concerning ACE's valuation. The first, Robert Kester (Kester), was the court's appointed expert. The circuit court's fact findings regarding his valuation are as follows:

Mr. Kester explained that there are three generally accepted methods for valuing a business – the capitalization of benefits method (sometimes called the income approach), asset approach, and market approach. Mr. Kester considered the asset approach and the income approach; he ultimately relied on the adjusted book value method under the asset approach in determining the value of Ken's interest.

Mr. Kester explained that he disregarded the capitalization of benefits method because the value of the entire practice had a negative value. When the calculation of the capitalization of benefits produces a negative value, the company has no goodwill value. Had Mr. Kester determined that ACE had a value in excess of its tangible assets, or goodwill value, he would have been required under Kentucky law to further determine what portion of the goodwill was personal versus enterprise goodwill. In the present case Mr. Kester determined that ACE does not have any goodwill value.

The primary asset of ACE is the accounts receivable which made up the majority of the book value as calculated under the asset approach. Mr. Kester determined the total value of ACE to be $567,000. He then applied a 5% minority of interest discount and a 5% lack of marketability discount. Mr. Kester explained that the discounts were appropriate because Ken owns a minority interest in ACE and he could not easily sell his interest in the practice because it is not a public company.

Mr. Kester valued Ken's 26% interest in ACE as of June 30, 2018, to be $133,120. Mr. Kester acknowledged that Ken's interest as calculated by the Employment Agreement on the same date would be $209,721. He testified that he had never before performed a valuation when an actual buyout [of] an owner took place on the same day as the valuation.

The second expert was Lisa's hired expert, Roman Basi (Basi). The circuit court found the following with regard to his valuation:

5

[Basi] ... valued ACE using the capitalization method and came to a significantly higher result. Mr. Kester testified that he believed it was inappropriate to add back expenses for profit-sharing, the cost of life and disability insurance policies for all employees, and a portion of Ken's salary [which Basi did in his calculation]. In addition, Mr. Basi did not deduct minority of interest or lack of marketability discounts.

Mr. Basi valued Ken's [35.14%] interest in ACE at $1,350,456. However, the court found Mr. Kester's testimony about the method and calculation of valuing ACE to be persuasive. Ken agreed to value this ownership interest in ACE according to the Employment

Agreement as calculated by Mr. Nunnelly even though the result is higher than Mr. Kester's evaluation.

After considering all three valuation methods and results, the circuit court found "that the value of Ken's ownership interest in ACE is the value as calculated in his Employment Agreement." The court reasoned that there was "no reason to believe that the amount actually paid to Dr. Shanahan for his interest in ACE was anything other than fair market value." Accordingly, the court found that Ken's 26% ownership interest as of June 30, 2018, was valued at $209,721, while his 35.14% ownership interest as of June 30, 2019, was worth $232,720.

Regarding the division of Ken's ownership interest, Ken requested that his ownership interest as of June 30, 2018, be divided equally between himself and Lisa. But he further asked that the increase in value after June 30, 2018, be awarded to him solely. He acknowledged that the increase was martial property, but argued that by June 30, 2018, he and Lisa were already separated, and she therefore did not contribute to his attaining the increase in value. Lisa argued that the percentage to be divided was 35.14% because that

6

would be the ownership percentage on the date the divorce decree would later be entered. The circuit court ruled:

> [T]he court finds that it is appropriate to value Ken's ownership interest as of June 30, 2018, when Dr. Shanahan retired. Even though Ken currently owns a greater share of ACE, the Court finds that the additional shares acquired in 2018 should be awarded to him solely. The parties shall equally divide the value of Ken's ownership interest in ACE as calculated by his Employment Agreement as of June 30, 2018.

## C. Spousal Maintenance

Lisa also requested that she be awarded spousal maintenance. Pursuant to KRS 403.200(1), an award of maintenance is only appropriate if the spouse seeking it: (1) lacks sufficient property to provide for his or her reasonable needs, and (2) is unable to support himself or herself through appropriate employment.

To determine Lisa's ability to work and earn money, the court appointed Linda Jones (Jones) of Vocational Economics, Inc. Jones testified that Lisa had previously attained a bachelor's degree in elementary education, a master's degree in guidance and counseling, a Rank I in guidance counseling, as well as three lifetime certificates and endorsements in teaching and counseling. Jones opined that, given Lisa's qualifications and previous work experience, returning to work as an elementary teacher would be Lisa's best option for employment. Jones predicted that Lisa could earn between $53,000 and $59,000 per year working as a full-time teacher. In the alternative, Lisa could earn roughly $15,000 per year ($1,250 per month) as a substitute teacher working three days a week. Jones acknowledged that Lisa would likely need to take

7

additional college courses to update herself on teaching practices and technology beforehand.

Lisa disputed her ability to return to the workforce primarily because of her youngest son Samuel's medical condition. In April 2018, a year after Ken left the marital home, Samuel developed a rare condition called Moyamoya disease. The disease caused two of the four major arteries that supplied blood to Samuel's brain to become partially or entirely blocked. Samuel went through three brain surgeries to correct the issue, which were successful. At the time of the trial, Samuel was still experiencing daily headaches which varied in severity. Samuel was able to attend high school, but frequently had to come home early due to headaches (impressively, Samuel was able to maintain an A and B average in school throughout his entire ordeal). Ken testified that Samuel's headaches were likely to diminish as his condition stabilized, and he had recently responded very well to Botox injections as a form of treatment.

Lisa argued that she was unsure of her ability to have a full-time job due to her role as Samuel's primary caregiver. She testified that she must be available at a moment's notice to pick Samuel up from school if his headaches become too severe, which was a frequent occurrence. Ken countered that either he or the parties' other adult children who live in Louisville could pick Samuel up from school if Lisa was unavailable. Lisa also cited her age, 57, and several medical conditions as reasons that returning to teaching was not feasible. However, as the court noted in its order, "she did not provide the

8

court with any documentation of a medical condition that would prevent her from maintaining gainful employment."

The court's order stated that it was "skeptical that Lisa could return to teaching full time at her age after thirty years away from the classroom." It further stated it was "not certain how realistic it [was] to expect Lisa to work full time as a classroom teacher, a job which typically has very little flexibility, given the unpredictable nature and frequency of Samuel's needs." Nevertheless, the court imputed an income of $1,500 per month to Lisa.

Concerning whether Lisa had sufficient property to pay for her reasonable needs, Lisa provided a list of her monthly expenses prepared by her financial planner, Brian Haehl (Haehl). Haehl prepared his report by utilizing the parties' joint checking account records and Lisa's credit card history. The court found that both parties provided significant financial support for their adult children. The court consequently deducted expenses totaling $1,591 "for fuel, restaurants, and groceries for the parties' adult children" from Lisa's monthly expenses. The court also deducted several expenses that Lisa was no longer paying. Finally, the court deducted $700 per month "for savings" and $2,083 per month "for retirement contributions."

After making the foregoing deductions, the court found that Lisa's reasonable monthly expenses were approximately $13,000, and that she did not have sufficient property or income to meet her monthly financial needs. It accordingly found that an award of maintenance was appropriate.

As for the amount of Lisa's maintenance, the court cited KRS 403.200(2)'s list of factors that it was mandated to consider in awarding maintenance. It then applied the following analysis under those factors:

> Ken is also 57 years old. He has Type 1 diabetes; his condition is well managed and does not currently impede his ability to work as an anesthesiologist. During the parties' marriage, Ken was the family's sole source of income. The parties maintained a comfortable lifestyle, provided their children with private educations and other amenities. The result is that the parties have not accumulated much joint savings. The parties' retirement accounts will be equally divided as will the equity in their marital residence. Ken's income is the remaining asset of value. While there has been some fluctuation in Ken's annual gross income in recent years, in 2018, he had gross monthly income of $65,040 and net (after tax) income of $37,387.
>
> The court has reviewed Ken's list of monthly expenses. He included expenses he pays for the parties' adult children and Samuel's tuition at Trinity High School. The court will also consider Ken's obligation to pay child support and a proportional share of Samuel's extraordinary medical expenses as set out herein. The Court finds that Ken's regular monthly expenses are approximately $14,000, including his child support obligation. The court finds that Ken's income is sufficient to meet his reasonable needs and to pay child support and maintenance to Lisa.
>
> Lisa is awarded significant property herein, including retirement benefits which will be a future source of regular income. Given the length of the parties' marriage and Ken's financial support for Lisa during the parties' separation, the court finds that it is appropriate to award Lisa maintenance for a period of eight years. At that time, both parties will be over 65 and eligible to withdraw retirement benefits. During the period of Lisa's maintenance award, she will be receiving significant income, which she can supplement through her own employment to plan for her retirement.

The court awarded Lisa maintenance of $12,500 per month to be paid for ninety-six months.

10

## D. Attorney's Fees

Finally, Lisa requested that the outstanding balance of her attorney's fees as well as the $17,500 loan she received from her brother to pay her expert. The court made the following findings:

> Under KRS 403.220, this Court is authorized to award attorney's fees after considering the financial resources of the parties. In the present case . . . Ken has paid $47,108.00 to his own attorney and advanced $33,074.00 to Lisa's attorney. In addition, Ken paid $16,630.00 to Blue & Co. for Mr. Kester's report and testimony and $3,100.00 to Linda Jones.

> Lisa has incurred attorney's fees of $52,624.37, of which $23,673.37 is outstanding. Lisa also incurred $23,500 in expert witness costs.

> This Court ordered Ken to advance $25,000 to Lisa's attorney in March 2019 after having ordered a previous advance of $8,074.15. The allocation of prior advances was reserved. Ken is requesting that $10,000 of the monies advanced be allocated to Lisa's share of the marital estate.

The court ruled that each party was responsible for his or her own outstanding attorney's fees, and that Ken was not responsible for paying Lisa's expert witness or repaying the loan from her brother.

Following the entry of the circuit court's order, Lisa filed both a motion for specific factual findings and a motion to alter, amend, or vacate pursuant to CR[3] 59.05. In her motion for specific factual findings, Lisa requested more specific findings regarding the financial needs of the parties. Specifically, "in the deductions taken and specific dollar amounts." In her motion to alter, amend, or vacate, Lisa argued: that the court erred by awarding 100% of Ken's

---

[3] Kentucky Rule of Civil Procedure.

11

401(k) contributions to Ken after April 1, 2017; that the court erred by awarding 100% of the ACE's ownership interest to Ken after June 30, 2018; that the court should reconsider "the valuation of the practice as a whole"; that the court should revisit the issue of maintenance, taking into consideration how the $68,379.50 in equalization payments Lisa owed Ken under the court's order,[4] as well as the court's ruling on attorney's fees, impacted Lisa's monthly expenses; and that the court's ruling on attorney's fees was error as Ken was able to pay all of his litigation expenses with martial funds, but Lisa was not.

In a subsequent order, the circuit court overruled both of Lisa's motions. First, regarding the valuation and division of Ken's ownership interest in ACE, the court ruled:

> As to the valuation of [ACE], this Court affirms the valuation of the marital share of Ken's interest as co-owner of that medical practice. The Court, as stated in the February 21, 2020, Findings of Fact and Conclusions of Law, used the fair market value as determined by [the] buyout of one of the partners in 2018. The court's explanation of this calculation in that Order clearly references consideration of the testimony of both experts who testified at the hearing with due consideration given to each approach. The Court declines to make further findings or to alter previous findings on the issue of valuation of the marital share of the medical practice.
>
> The Court recognizes that the value of Ken's interest in ACE at the date of the Decree of Dissolution is a marital asset under *Stallings v. Stallings*, 606 S.W.2d 163 (Ky. 1980). However, it is within this Court's discretion to divide martial assets as it deems equitable. The Court awarded Ken the increase in value of his interest in the

---

[4] The court's order recounts that Lisa owed Ken $178,154.00 for his share of the equity in the marital residence in accordance with their agreed stipulations, while Ken owed Lisa $104,860.50 as her share of his ownership interest in ACE plus $4,914 for the life insurance policies awarded to him under the order. Lisa accordingly owed Ken an equalization debt of $68,379.50.

12

ACE post-separation as sanctioned by the Kentucky Court of Appeals in *Story v. Story*, [2008-CA-001301-MR, 2009 WL 3486667 (Ky. App. Oct. 30, 2009)]. The Court does not believe that valuation was an error and declines to alter that finding.

Concerning the award of maintenance, the court stated:

[T]he Court rests on the five pages of detailed findings, including reference to and consideration of the factors as set forth in KRS 403.200 contained in the February 21, 2020 Order. The Court points out to Lisa that while the court-appointed expert testified about Lisa's ability to earn up to $59,000 per year, the Court found that unlikely and, in its calculations, only attributed $1,500 per month for [Lisa's] income. The Court was not presented with any medical evidence during the trial that Lisa is physically unable to do any type of work. The parties had been separated for over

two years before the Decree of Dissolution was entered; in that time, Lisa made no efforts to obtain gainful employment of any kind. The Court affirms the award of $150,000 per year to Lisa in maintenance payments for the next ninety-six months.

Finally, the court simply stated that it reaffirmed its rulings with regard to the allocation of attorney's fees. It did not address Lisa's arguments concerning division of the ACE 401(k). The circuit court entered a limited decree of dissolution of marriage on December 19, 2019.

On appeal, a split Court of Appeals panel affirmed the circuit court's rulings in full.[5] In her dissent, Judge Caldwell agreed with the majority opinion save for three issues.[6] First, with regard to the division of the ACE 401(k) and the division of the ACE ownership interest, she argued that the circuit court's fact findings did "not support an allocation of marital assets

---

[5] *Thielmeier v. Thielmeier*, 2020-CA-0707-MR, 2021 WL 4126889, at *6 (Ky. App. Sept. 10, 2021).

[6] *Id.* at *7 (Caldwell, J., dissenting).

13

being based on the date [Ken] decided to move out of the marital home."[7] Further, the circuit court's order was fundamentally at odds with itself. Specifically, the circuit court declined to rule that Lisa could return to full-time work, in part, due to Samuel's ongoing needs.[8] And yet, it awarded 100% of the post-separation assets to Ken based on his argument that Lisa contributed nothing to the marital assets post-separation.[9] The dissent asserted that this division of the assets clearly showed that the circuit court "could not have considered [Lisa's] contribution as a homemaker as required by KRS 403.190(1)(a)."[10] The circuit court also failed to provide sufficient fact findings as to why the unequal division of the assets was equitable.[11]

Judge Caldwell also would have held that the trial court abused its discretion by allowing Ken to use marital funds to pay all of his attorney's fees while Lisa had to borrow funds and use post-divorce assets awarded to her to pay her legal fees.[12] Again, Judge Caldwell would have held that the circuit court did not provide a sufficient analysis regarding how the facts of the case led to that ruling.[13]

---

[7] *Id.* at *6.

[8] *Id.* at *7.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.* at *8.

[13] *Id.*

Lisa now appeals to this Court. Additional facts are discussed below as necessary.

## II. ANALYSIS

Lisa renews her arguments before this Court concerning the circuit court's division of Ken's ACE 401(k); its valuation of Ken's ownership interest in ACE; its division of Ken's ownership interest in ACE; its award of maintenance; and its ruling on attorney's fees. We will discuss each in turn.

**A. The circuit court erred in its division of Ken's ACE 401(k).**

When dividing martial property in a dissolution proceeding, a trial court must perform the following steps: (1) categorize each piece of contested property as either marital or nonmarital; (2) assign each party's nonmarital property to that party; and (3) equitably divide the parties' marital property.[14] Trial courts have broad discretion in dividing marital property, and this Court may not disturb a trial court's ruling on the division of marital property unless it has abused its discretion.[15] "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[16]

Here, it was undisputed that Ken's ACE 401(k) was marital property. The circuit court noted at the outset in its findings of fact and conclusions of

---

[14] *See, e.g.*, *Travis v. Travis*, 59 S.W.3d 904, 908-09 (Ky. 2001).

[15] *See, e.g.*, *Smith v. Smith*, 235 S.W.3d 1, 6 (Ky. App. 2006).

[16] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

15

law that "[t]he parties stipulate that all of their property is marital," except for a non-marital piece of real estate that is not at issue. Even absent such a stipulation, the account was without question martial property under KRS 403.190[17] and applicable case law.[18] Accordingly, the circuit court first erred by dividing the ACE 401(k) as of May 1, 2017. Instead, it should have divided it as of December 19, 2019, the date of the divorce decree.

The circuit court further erred in awarding Lisa nothing of the contributions Ken made to the 401(k) account after separation. The court agreed with Ken "that KRS 403.190(1)(a) permits him to retain 100% of the post-separation to his 401(k) contributions." But it did not engage in any analysis as to why it considered that division just under the facts before it. This alone is grounds for reversal, as a trial court must actually engage with the KRS 403.190(1) factors when dividing martial property; simply citing the statute is not enough.[19]

In addition, KRS 403.190(1)(a) states that when dividing martial property, the trial court must consider the "[c]ontribution of each spouse to acquisition of the marital property, including contribution of a spouse as a homemaker[.]" Based on the circuit court's citation to KRS 403.190(1)(a), it

---

[17] KRS 409.190(3) ("All property acquired by either spouse after the marriage and before a decree of legal separation is presumed to be martial property[.]"). Neither party asserted that any of the exceptions to this statute applied to the ACE 401(k).

[18] *Stallings*, 606 S.W.2d at 164 (holding that all property acquired during a period of separation is martial unless one of the exceptions under KRS 409.190(2) applies).

[19] *Id.* at 164 ("[I]n distributing the marital property, the trial court shall consider the factors in KRS 403.190(1)(a)-(d).").

seemed to rely upon Ken's sole argument that Lisa did not contribute to the 401(k) after he left the marital residence. This is fundamentally at odds with the court's other findings. When addressing spousal maintenance, the court declined to find that Lisa could return to the workforce full-time, in part, due to "the unpredictable nature and frequency of Samuel's medical needs." Consequently, under the court's own finding, Lisa was still contributing to Ken's ability to contribute to the 401(k) after he left the marital residence by being Samuel's primary caregiver. It is well-established that "the contribution of a spouse as a homemaker does not necessarily cease when the other spouse leaves, especially when minor children remain with the homemaker-spouse."[20]

For the foregoing reasons, the circuit court's division of Ken's ACE 401(k) account after May 1, 2017, was an abuse of discretion and we reverse. On remand, the circuit court shall readdress the division of the ACE 401(k) as of December 19, 2019, the date the divorce decree was entered, and shall explain why its chosen division is just under KRS 403.190(1)(a)-(d).

**B. The circuit court did not err in its valuation of Ken's ACE ownership interest, but it did err in its distribution of that ownership interest.**

Lisa next asserts that the circuit court erred with respect to the method it adopted in valuing Ken's ACE ownership interest. She further contends that the court erred by awarding Ken 100% of the value of his ownership interest after June 30, 2018. We will discuss each argument in turn.

---

[20] *Id.*

17

An appellate court may not disturb a trial court's ruling on the valuation of a business in a dissolution proceeding unless it was clearly contrary to the weight of the evidence.[21] This Commonwealth has historically declined to adopt a particular method for valuing an ownership interest in the dissolution context.[22] Rather, appellate courts ask only whether "the trial court's approach reasonably approximated the net value of the partnership interest."[23]

Lisa first asserts that the circuit court improperly disregarded Basi's determination that ACE had goodwill. While it is true that *Heller, supra,* held that a business' goodwill should be considered when determining a business' value,[24] it did not hold that all businesses have goodwill.[25]

Here, the buyout provision's formula did not account for goodwill. However, Kester explained that among the three different methods used to value a business—the capitalization of income approach, the asset approach, and the market approach—the adjusted book value method under the asset approach was the best approach given the nature of ACE as a business. In reaching this conclusion, Kester also ran the numbers using the capitalization of income approach. He determined that ACE had a negative value using the capitalization of income approach, and that it therefore had no goodwill. Basi,

---

[21] *Clark v. Clark,* 782 S.W.2d 56, 58 (Ky. App. 1990) (citing *Heller v. Heller,* 672 S.W.2d 945 (Ky. App. 1984)).

[22] *Clark,* 782 S.W.2d at 59.

[23] *Id.*

[24] *Heller,* 672 S.W.2d at 947.

[25] *Gomez v. Gomez,* 168 S.W.3d 51, 55 (Ky. App. 2005).

using the capitalization of income approach, found that ACE had goodwill only after adding back expenses for ACE's 401(k) plan, the cost of life and disability insurance plans for all employees, and what he felt was Ken's excess salary. Kester believed that each of those add backs were inappropriate and resulted in an inflated value. The circuit court found that Kester's method of valuation was persuasive, i.e., it agreed with Kester that ACE had no goodwill to consider when determining its value. This was not clearly contrary to the weight of the evidence.

Next, Lisa argues that the circuit court erred by using the buyout provision in Ken's employment agreement to value his ownership interest. She argues that it should have used Basi's valuation instead. As noted, the circuit court did not find Basi's calculations appropriate. And, in addition to Kester's testimony regarding why Basi's valuation was flawed, Basi also admitted during cross-examination that he did not know basic things about ACE. For example, he did not know how many hospitals ACE contracted with or the duration of those contracts. Further, Basi's valuation of ACE as a whole was incredibly high compared to the values reached under the buyout provision and Kester's analysis, respectively. As of June 30, 2018, ACE's overall value was $806,621 under the buyout provision, and was $567,000 under Kester's valuation. Basi's valuation of $3,843,073 as of June 30, 2018, was well-over quadruple either of those amounts. We cannot say that the circuit court's refusal to use Basi's valuation was clearly contrary to the weight of the evidence.

19

This leaves the circuit court's decision to value Ken's ownership interest in accordance with ACE's buyout provision. We note first that the valuation of ACE under the buyout provision was greater than Kester's valuation, and in that sense actually benefitted Lisa considering that the court appropriately declined to use Basi's valuation. With that said, in general

> while buy-sell agreements or corporate by-laws have been rejected as the basis for valuing a professional practice where this would not accurately reflect the value of the business, *Clark, supra*, 782 S.W.2d at 60, they may be used as a factor in reaching a determination regarding the value of a professional business.[26]

For example, in *Gomez, supra*, the Court of Appeals reviewed a trial court's valuation of a husband's 1/3 interest in a radiology practice in a dissolution proceeding.[27] The trial court heard evidence from two experts.[28] The husband's expert valued his interest in the practice at just over $100,000, and did not include an amount for goodwill.[29] The wife's expert valued the ownership interest at $932,880, and included a calculation for goodwill based on the capitalization of excess earnings approach.[30] The trial court adopted the husband's expert's valuation, finding the radiology company's practice "with respect to those physicians entering or exiting the practice to be significant."[31] Specifically, the husband submitted

---

[26] *Gomez*, 168 S.W.3d at 56.

[27] *Id.* at 53.

[28] *Id.* at 55.

[29] *Id.*

[30] *Id.*

[31] *Id.* at 56.

affidavits from other physicians who had left the practice that when a physician joined or left the group an evaluation of the current accounts receivable was done. Based on that value a physician entering or leaving the practice had to pay or was paid a percentage of the accounts receivable value.[32]

The Court of Appeals affirmed, reasoning:

> while we would have reached a different conclusion on the evidence presented in this case, the trial court's determination that no goodwill existed because of the historical way in which the practice valued itself is supported by substantial evidence. Further, a review of the expert testimony in this case reveals that [the wife's] expert's valuation suffered from some problems according to [the husband's] experts. Our task is to determine whether the trial court's finding of fact as to valuation of the business is clearly erroneous. If substantial evidence exists to support the decision, then we are bound to affirm and we do so here.[33]

In this case, substantial evidence supported the circuit court's decision to use the buyout provision to value Ken's ownership percentage in ACE. The circuit court thoroughly recounted the evidence produced by all three experts and found the buyout provision to be the most appropriate method to value Ken's ownership. We cannot hold that this was clearly contrary to the weight of the evidence and must accordingly affirm.

However, the circuit court did err in its division of Ken's ownership interest. Again, we review a trial court's decision on the division of martial property for abuse of discretion.[34] First, the trial court erred by dividing the ownership interest as of June 30, 2018. The increase in the accounts value

---

[32] *Id.*

[33] *Id.*

[34] *Smith*, 235 S.W.3d at 6.

21

was indisputably marital property, and should have therefore been divided as of the date the dissolution decree was entered. Further, the court provided absolutely no reasoning as to why it awarded Ken 100% of the ownership interest. It simply stated, "[e]ven though Ken currently owns a greater share of ACE, the Court finds that the additional shares acquired in 2018 should be awarded to him solely." Similar to the division of the ACE 401(k), the circuit court was required to address why its chosen division was just under the factors enumerated in KRS 403.190(1)(a)-(d), and its failure to do so was error.

On remand, the circuit court shall readdress the division of Ken's ownership interest. It shall divide the interest as of December 19, 2019, and shall explain why its chosen division is just under KRS 403.190(1)(a)-(d), taking into consideration Lisa's continued contributions as Samuel's primary caregiver.

**C. The circuit court erred in its ruling on attorney's fees.**

Lisa also argues that the circuit court erred by failing to award her the outstanding balance on her attorney's and expert's fees. Pursuant to KRS 403.220

> [t]he court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment.

A trial court's ruling concerning an award of attorney's fees in a dissolution action will not be disturbed on appeal absent an abuse of discretion.[35]

Lisa requested that the court award her outstanding attorney's fees totaling $23,673.37, and outstanding expert fees totaling $17,500, i.e., money to repay her brother for the loan he gave her to pay for her expert. The court denied her request, citing that Ken paid for both of the court's appointed experts, and had already "advanced $33,074.00 to Lisa's attorney." This ruling resulted in Ken owing no outstanding balance to his attorneys, while Lisa owes her attorneys and expert $41,174.

Lisa's argument is simple: until the divorce decree was entered, all of the funds used to pay lawyers and experts were martial property. Ken was therefore able to pay for all of his litigation expenses using martial funds, but Lisa was not. We agree with Lisa that this decision was unreasonable and unfair and was accordingly an abuse of discretion. We reverse and order that on remand Lisa be awarded $23,673.37 for her outstanding attorney's fees, and $17,500 for her outstanding expert fee.

## D. Given this Court's other holdings herein, reconsideration of maintenance is required.

Lisa also alleges that the circuit court made several errors in its award of maintenance. We decline to address those arguments here, as maintenance will necessarily have to be re-addressed by the court after it rules on the division of the ACE 401(k), the ownership interest in ACE, and awards Lisa

---

[35] *Sexton v. Sexton,* 125 S.W.3d 258, 272 (Ky. 2004).

attorney and expert fees consistent with this opinion. We hold only that the circuit court did not err by deducting expenses from Lisa's monthly expenditures for expenses related to the parties' adult children. Even if such expenses were part of the parties' standard of living during the marriage, spousal maintenance only contemplates necessary living expenses for the spouse, not the spouse's adult children. Lisa is free to raise all other arguments raised before this Court to the circuit court for consideration. The circuit court is directed on remand to reconsider the award of spousal maintenance by applying the appropriate statutory factors under KRS 403.200.

## III. CONCLUSION

Based on the foregoing, we affirm in part and reverse in part. We remand to the circuit court for further proceedings, as the court deems appropriate, consistent with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:

John Harold Helmers, Jr.
Melina Ann Hettiaratchi
Helmers & Associates

COUNSEL FOR APPELLEE:

Peter James Catalano
Melanie Lee Straw-Boone
Straw-Boone Doheny Banks & Mudd, PLLC